PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HOLLY HILL FARM CORPORATION,
            *Plaintiff-Appellant,*

v.                                                    No. 05-1857

UNITED STATES OF AMERICA,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Dennis W. Dohnal, Magistrate Judge.
(CA-04-856-3)

Argued: March 15, 2006

Decided: May 8, 2006

Before MOTZ and TRAXLER, Circuit Judges, and
James P. JONES, Chief United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Chief District Judge Jones wrote the
opinion, in which Judge Motz and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** John Frederick Ames, Richmond, Virginia, for Appellant.
Tara Louise Casey, Assistant United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Richmond, Virginia, for
Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney,
Alexandria, Virginia, for Appellee.

**OPINION**

JONES, Chief District Judge:

This case involves the judicial review of the final decision of appellee United States of America, acting through the United States Department of Agriculture ("USDA"), denying appellant Holly Hill Farm Corporation's application for farm benefits. Because we agree with the district court that the agency's decision was not arbitrary or capricious nor the result of an abuse of discretion, we affirm.

I.

Holly Hill Farm Corporation ("Holly Hill") owns a 650-acre estate in Caroline County, Virginia, and operates a farm, Farm Serial Number 1075 ("FSN 1075"), under the Direct County-Cyclical Program ("DCP"), administered by the USDA. The DCP provides income support to producers of eligible crops. At issue in the present case is Field 16 of FSN 1075, which is located between the Mattaponi River and Route 207 in Caroline County. Field 16 consists of three and one-half acres and includes approximately one acre that has been designated as an illegally converted wetland. This designation rendered Holly Hills ineligible for program benefits and is thus the subject of this appeal.

The chain of events resulting in the designation at issue began on May 16, 1989, when George R. Ways, District Conservationist for the Soil Conservation Service ("SCS")[1], confirmed the presence of hydric soil on FSN 1075. Because such soil indicates the possible presence of wetlands, Ways advised Holly Hill in a letter dated February 7, 1990, to seek a determination of the wetland status of FSN 1075 before beginning the clearing of any woodland. Ways explained that the clearing of woodland that may also be wetland for use as a pasture would not violate the 1985 Farm Bill, but attached an article suggest-

---

[1]The Soil Conservation Service ("SCS") became the National Resources Conservation Service ("NRCS") on October 20, 1994. The SCS/NRCS is the division of the USDA responsible for making wetland determinations.

ing that destruction of wetland for any purposes may violate other laws.

In a subsequent letter dated March 6, 1990, Ways noted that at that time Field 16 was designated as woodland and that clearing was in progress in that field and others without prior planning or approval by SCS. Ways advised Holly Hill "that the clearing of wetland could result in a violation of Federal Wetland Laws" and made arrangements for SCS to map the soils on the entire property and make a wetlands determination. (J.A. 229.)

On June 11, 1990, SCS notified Holly Hill that Fields 6, 9, 10, and an unnumbered area northeast of Field 11 were designated as wetlands. The soil map accompanying the report and the wetland determination itself specifically stated that "[w]etland determinations have been made only for areas specifically delineated." (J.A. 230, 231.) The disclaimer on the soil map additionally provided that "[a]reas not marked as wetlands may contain areas of wet (hydric) soils. On-site Investigation will be required to determine if these areas are wetlands." (J.A. 231.) Holly Hill appealed, and there were some revisions to the dimensions of the land designated as wetland in Fields 6 and 9. A review of the record performed during this appeal process revealed that "wetland determination disclaimer statements are inappropriate on [the] soil map." (J.A. 233E.) On August 23, 1991, SCS completed and certified a revised wetland determination designating Fields 6, 9, 10, and an unnumbered area northeast of Field 11 as wetlands. There was no reference to Field 16 in this official wetland determination.

Also in 1991, the USDA received a whistle-blower complaint regarding possible wetland conversions on Holly Hill's property. Holly Hill refused USDA officials access to the property in order to investigate the complaint, and accordingly the USDA automatically denied farm benefits according to Farm Services Agency ("FSA") procedure. Holly Hill again denied USDA access to investigate the whistle blower complaint in 1994. Additionally, in 1995, the Environmental Protection Agency ("EPA") issued an "Order for Compliance" instructing Holly Hill to cease unauthorized filling of wetlands in violation of the Clean Water Act and noted in the order that Holly Hill

had previously denied the USDA, Army Corps of Engineers, and NRCS access to the property in order to investigate the matter.

For crop year 2002, Holly Hill applied for program benefits for FSN 1075. NRCS responded in November 2002 that Holly Hill would be ineligible unless it allowed NRCS officials access to investigate the outstanding wetland noncompliance complaint and establish a conservation plan for the farm. Holly Hill initially resisted, but eventually granted access to the property in June 2003. On August 1, 2003, NRCS conducted an initial survey and determined that one acre of land in Field 16 of FSN 1075 contained wetlands converted after November 28, 1990. This determination was based on the presence of hydrology and hydric soils, and on aerial photographs from 1993-2002 demonstrating a conversion from bottomland hardwoods to pastureland in or around 1994.

The determination became final, and on November 3, 2003, Holly Hill appealed to the Hanover/Caroline FSA County Committee ("FSA county committee"). The FSA county committee held a hearing on December 19, 2003, decided that the case warranted a review by the NRCS State Conservationist, and referred the matter to NRCS. On January 20, 2004, the State Conservationist concluded that the converted wetland determination was technically accurate and final. The County Executive Director of the FSA county committee notified Holly Hill of the State Conservationist's conclusion and informed Holly Hill that it was thus not eligible for program benefits.

Holly Hill appealed to the National Appeals Division ("NAD") of the USDA on April 9, 2004. Holly Hill requested subpoenas for four NRCS and three EPA employees to testify at the hearing. The Hearing Officer faxed this subpoena request to the USDA, and the USDA responded that it would send Dan Solomon, Farm Bill Program Manager, and Jerry Quesenberry, the soil scientist responsible for wetland determinations in the area of Virginia encompassing Holly Hill's property, neither of whom were among those witnesses requested by Holly Hill. The NAD Hearing Officer denied all of Holly Hill's subpoena requests on the grounds that the requested witnesses did not possess specific relevant information not otherwise available.

The NAD hearing was held June 23, 2004. During the hearing, Holly Hill objected when the NAD Hearing Officer questioned the

USDA officials, arguing that the Hearing Officer was thereby leading the government through the case. On July 22, 2004, the NAD Hearing Officer issued a decision holding that the FSA's denial of program benefits based on the NRCS technical determination of wetland conversion after November 28, 1990, was not erroneous. Holly Hill requested that the NAD Director review the NAD Hearing Officer's determination, and the NAD Director upheld the NAD Hearing Officer's determination on October 21, 2004, constituting final agency action. Holly Hill appealed to the district court, asserting that the USDA abused its discretion, took unreasonable action, and issued an arbitrary and capricious decision.

In its memorandum opinion granting the government's motion for summary judgment, the district court found that (1) the NAD Hearing Officer did not abuse his discretion when he confined the evidence presented at the hearing to what he determined was relevant and non-repetitious; (2) the NAD Hearing Officer did not abuse his discretion when he denied Holly Hill's requests for witness subpoenas; (3) the NAD Hearing Officer's ex parte communication did not relate to the merits of the appeal, but rather only to procedural matters, and was thus not prohibited; (4) the NAD Hearing Officer's attempt to clarify questions and answers, and to obtain all the applicable evidence, did not evidence an improper bias or prejudice toward the defendant; and (5) the USDA's substantive decision to deny program benefits based on its determination that Field 16 contained converted wetlands was supported by substantial evidence and thus not arbitrary or capricious.

II.

On appeal, Holly Hill makes four substantive arguments in support of its claim that the USDA's denial of benefits was arbitrary and capricious. First, Holly Hill argues that the USDA determined that Field 16 was not a wetland in 1991, and that the USDA should be bound by this determination as well as by Ways' statement in his February 7, 1990, letter to Holly Hill that clearing of Field 16 would not violate the 1985 Farm Bill. Second, Holly Hill contends that the USDA's determination that Field 16 was converted after November 28, 1990, is arbitrary and capricious. Third, Holly Hill argues that even if the wetlands on Field 16 were converted after November 28, 1990, all of the evidence regarding the alleged scope of the conver-

sion supports the conclusion that Holly Hill is entitled to a minimal effects exception under the Regulations. Lastly, Holly Hill challenges the manner in which the NAD hearing was conducted, asserting that the Hearing Officer's denial of subpoena requests, ex parte contact with the USDA, and questioning of government witnesses violated due process.

This court reviews the district court's grant of summary judgment de novo. *See Marshall v. Cuomo*, 192 F.3d 473, 478 (4th Cir. 1999). Our review of the underlying USDA denial of benefits, however, is conducted pursuant to the Administrative Procedure Act ("APA"), which provides, in relevant part, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996); *see Marshall*, 192 F.3d at 478. In determining whether agency action violates § 706(2)(A), "we perform 'only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes,' and whether the agency has committed 'a clear error of judgment.'" *Maryland Dep't of Human Res. v. USDA*, 976 F.2d 1462, 1475 (4th Cir. 1992) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)), and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416.

Before turning to Holly Hill's substantive arguments, it is useful to set forth the statutory framework underlying this appeal. The "Swampbuster" provision of the Food Security Act of 1985 prohibits farmers who participate in USDA programs from converting wetlands and then producing an agricultural commodity on those converted wetlands. 16 U.S.C.A. § 3821(a)-(b) (West 2000). The Food, Agriculture, Conservation and Trade Act ("FACTA"), passed in 1990, extended the prohibition so that it is a violation when a wetland is converted in a way that production of an agricultural commodity is possible, even if an agricultural commodity has not actually been produced. 16 U.S.C.A. § 3821(c) (West 2000); 7 C.F.R. § 12.4(a)(3) (2005). FACTA also added a stronger penalty for converting a wetland. While converting a wetland prior to November 28, 1990,

resulted in only a proportional loss of benefits, conversion after that date results in the loss of all USDA benefits on all land the farmer controls until the wetland is restored or the loss mitigated. 16 U.S.C.A. §§ 3821(c), 3822(i) (West 2000). The USDA defines "converted wetland" as follows:

> Converted wetland is a wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including the removal of woody vegetation or any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity without further application of the manipulations described herein if:
>
> > (i)   Such production would not have been possible but for such action, and
> >
> > (ii)   Before such action such land was wetland, farmed wetland, or farmed-wetland pasture and was neither highly erodible land nor highly erodible cropland;

7 C.F.R. § 12.2(a) (2005); *see also* 16 U.S.C. § 3801(a)(4)(West 2000).

Responsibility for administering the Swampbuster provisions is divided between two USDA agencies—NRCS and FSA. NRCS makes all technical determinations, evaluates any restoration and mitigation plans, and conducts monitoring activities. 16 U.S.C.A. § 3822(j) (West 2000); *see also* 7 C.F.R. § 12.6(c) (2005) (setting forth specific determinations to be made by NRCS). The responsibilities of the FSA include making determinations on (1) the ineligibility of benefits; (2) whether the violations were made in good faith; and (3) whether any other exemptions apply to the conversion of the wetland. 7 C.F.R. §§ 12.6(a), 12.6(b)(3)(viii) (2005).

With this statutory regime in mind, as well as the applicable standard of review set forth above, we now turn to address each of Holly Hill's four substantive arguments.

A.

In its first argument, Holly Hill contends that any alleged conversion on its part is justifiable because (1) Field 16 was reviewed and designated as woodland as part of the final determination in 1991, and (2) George Ways advised, in his February 7, 1990, letter, that any conversion of woodland that contains a wetland would not violate the 1985 Farm Bill.

In support of its argument, Holly Hill relies on general due process principles as well as two regulatory provisions setting forth exemptions for situations in which applicants have placed reliance on NRCS wetlands determinations. The first exemption states that a person shall "not be ineligible for program benefits as a result of taking an action in reliance on a previous certified wetland determination by NRCS." 7 C.F.R. § 12.5(b)(6)(i) (2005). The second exemption provides that the USDA may make program benefits available if the appropriate USDA agency finds that "the action of a person which would form the basis of any ineligibility . . . was taken by such person in good-faith reliance on erroneous advice, information or action of any other authorized representative of USDA." 7 C.F.R. § 12.11 (2005).

Holly Hill's argument regarding the February 7, 1990, letter from Ways is clearly without merit. First, Holly Hill conceded during oral argument that there is no evidence in the record to show that Holly Hill actually relied on the letter from Ways. Indeed, Holly Hill asserts that no clearing took place on Field 16 after November 28, 1990. While Holly Hill is free to make alternative arguments in support of its position, arguing that no conversion took place during the relevant time period obviously undermines any contention that, had there been a clearing after November 28, 1990, it was made in reliance on Ways' letter.

Furthermore, the February 7, 1990, letter is an insufficient basis for the reliance exemptions for two additional reasons. The February 7 letter stated that

> As previously discussed the clearing of a woodland that may also be wetland for use as pasture is not a violation of the

> 1985 Farm Bill. However, the attached article sheds a different light on the destruction of wetland for any purpose.
>
> I suggest that before you proceed with any clearing of woodland that you request the [NCRS] to make a determination as to wetland status of the area.

(J.A. 234.) First, Ways specifically cautioned Holly Hill to consult with NRCS prior to any clearing of woodland. Furthermore, at the time Ways sent the letter, the stricter law punishing a wetland conversion that merely makes the production of an agricultural commodity possible had not yet been enacted. Thus, Ways' statement that clearing for use as a pasture did not violate the 1985 Farm Bill was accurate at the time it was made.

The law is clear that such statements would not excuse the clearing of woodland after November 28, 1990, when FACTA was enacted into law. Indeed "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law" and as such they are "held to the most demanding standards." *Heckler v. Cmty. Health Servs. of Crawford County*, 467 U.S. 51, 63 (1984). "Those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Id.* (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)). Statements regarding the propriety of clearing land for use as a pasture on February 7, 1990, do not justify any ignorance on the part of Holly Hill regarding the significant changes to the law that occurred subsequently on November 28, 1990.

Holly Hill's argument regarding the 1991 wetland determination is a closer question, but ultimately fails as well. The 1991 wetland determination fails to address Field 16. It could be argued that by designating Fields 6, 9, 10, and an unnumbered area as wetlands, SCS implicitly concluded that Field 16 was not a wetland. Ways' March 6, 1990, letter tends to support this argument, because he noted that "Fields 15 and 16 are designated as woodland" and explained that SCS would map the soils on the entire property prior to making the wetland determination. Nonetheless, both the designation itself and the soil map accompanying that initial determination clearly contain the same disclaimer: "Wetland determinations have been made only

for areas specifically delineated." (J.A. 230, 231.) The soil map contains an additional disclaimer providing that "areas not marked as wetlands may contain areas of wet (hydric) soils. On-site investigation will be required to determine if these areas are wetlands." (J.A. 231.)

Admittedly, during the appeal of the initial 1991 determination, SCS noted that "wetland determination disclaimer statements are inappropriate on the soil map," and the soil map accompanying the revised, final determination contained no disclaimers. (J.A. 233F, 240.) However, the same disclaimer that was present on the initial determination and initial soil map is included in the final determination completed on August 23, 1991. (J.A. 239.) Also, before the FSA county committee, Ways testified that the 1991 designation did not cover Field 16. Therefore, while there is conflicting evidence on the factual question of whether the status of Field 16 was designated non-wetland in the 1991 determination, there is sufficient evidence supporting the position that the 1991 determination did not address the status of Field 16. Accordingly, we find that the agency's decision that Holly Hill could not reasonably rely on the 1991 determination for matters involving Field 16 is not arbitrary, capricious, an abuse of discretion, or contrary to law.

B.

Next, Holly Hill contends that the USDA's decision that wetlands were converted on Field 16 around 1994 is not supported by the evidence and is thus both arbitrary and capricious. Holly Hill takes the position that the wetland in Field 16 was never converted,[2] and in the alternative that if it was converted, the conversion took place prior to November 28, 1990. Holly Hill claims that the only on-site factual information regarding a conversion is Ways' letter stating that removal of trees occurred on Field 16 prior to Spring 1990. Holly Hill also points to Ways' testimony that during his August 2003 visit he saw no evidence that trees or stumps had been removed from the area in question, and argues that the aerial photographs relied on to support

---

[2]At oral argument, Holly Hill conceded that Field 16 contained wetlands.

a determination of conversion in 1994 were unreliable and do not serve as a reasonable basis for the agency's decision.

An examination of the record convinces us that there is sufficient evidence on which the agency could base its decision that a wetland conversion occurred and that the conversion occurred after November 28, 1990. While Ways did indeed state that when he went on site at Field 16 on August 12, 2003, he saw no evidence of drainage, filling, ditching, or leveling and did not see any tree stumps, he also stated that "[t]here was evidence that vegetation ha[d] been cleared" based on the fact that documented history revealed that the field was previously wooded and at the time of the visit it was consistent with pastureland. (J.A. 113-23.) Other evidence that a clearing occurred on Field 16 includes the presence of a push pile of rotting material and dead stumps on Field 16 and a series of aerial photographs showing that at one time Field 16 consisted of a wooded area but that later the same land had been cleared.

With regard to the dates of those photographs, they are admittedly not certified with specific dates, but testimony from both the NRCS Soil Scientist and the Farm Bill Program Manager during the county committee hearing indicates that the first pictures, showing a wooded area, were taken in July of 1994, and that the later pictures, showing the same land area with cleared pastureland, were taken in June of 2001. (J.A. 131-32, 173.) This sworn testimony from NRCS employees provides a sound basis for the agency's decision. An agency "must be permitted 'to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Downer v. United States*, 97 F.3d 999, 1002 (8th Cir. 1996) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). Thus, evidence in the record exists supporting the determination that the land was converted after November 28, 1990, and such decision is thus not arbitrary, capricious, or an abuse of discretion.

## C.

Next, Holly Hill argues for the first time on appeal that even if the wetlands on Field 16 were converted after November 28, 1990, the FSA's determination that it is ineligible for benefits is fundamentally

flawed because the evidence regarding the alleged scope of the conversion supports the conclusion that it had "minimal effects." The minimal effects exemption provides that a producer may manipulate a wetland if the changes will have only a "minimal effect on the functional hydrological and biological value of the wetlands in the area." 16 U.S.C.A. § 3822(f)(West 2000). The regulations further provide that

> NRCS shall determine whether the effect of any action of a person associated with the conversion of a wetland . . . has a minimal effect on the functions and values of wetlands in the area. Such determination shall be based upon a functional assessment of functions and values of the wetland under consideration and other related wetlands in the area, and will be made through an on-site evaluation. A request for such determination will be made prior to the beginning of activities that would convert the wetland. If a person has converted a wetland and then seeks a determination that the effect of such conversion on wetland was minimal, the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal.

7 C.F.R. § 12.31(d) (2005). Holly Hill contends that because an NRCS representative had testified that normal circumstances existed at the site, the site was not significantly disturbed, and the site was not a problem area, a finding of minimal effects has been made warranting application of the exemption.

Holly Hill contends that this is not the first time it has raised the minimal effects argument, but the record shows that during the administrative proceedings and before the district court, Holly Hill's argument was that it did not convert the wetland at issue rather than that any conversion had a minimal effect. Holly Hill contends that it made the claim at the initial hearing when it challenged the determination as involving an insignificant amount of wetland with no discernable alteration. (J.A. 224.) Holly Hill further asserts that this argument was made in the request for Director Review when it argued that the site was not significantly disturbed per the agency and that the area was not a problem area per the agency. (J.A. 248.) Lastly, Holly Hill points to testimony of NRCS officials stating that Field 16

did not demonstrate any draining, filling, relocation of soil, or damn construction. (J.A. 415-16.) However, while these claims and evidence might be relevant to a minimal effects determination, it is clear that these assertions and citations to the record were made in support of Holly Hill's "no conversion" argument, which is separate and distinct from the minimal effects argument made before this court.

Because Holly Hill did not raise the minimal effects argument below, it faces a high hurdle in this court. In this circuit, "[i]ssues raised for the first time on appeal are generally not considered absent exceptional circumstances." *Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 614 (4th Cir. 2002). The underlying rationales for this rule are "respect for the lower court, [an avoidance of] unfair surprise to the other party, and the need for finality in litigation and conservation of judicial resources." *Wheatly v. Wicomico County, Md.*, 390 F.3d 328, 335 (4th Cir. 2004)(quoting *Tele-Communications, Inc. v. Commissioner*, 12 F.3d 1005, 1007 (10th Cir. 1993)) (internal quotation omitted). "Exceptions to this general rule are made only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993); *see also Nat'l Wildlife Fed'n. v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1998).

Holly Hill argues that plain error would result if we refuse to consider the minimal effects exemption, but we find this position unpersuasive. First, while Holly Hill takes the position that it is entitled to the minimal effects exemption as a matter of law and that no additional fact finding would be necessary, it seems clear that resolution of this claim would require remand to the agency. Although there was no evidence in the record that Holly Hill engaged in dredging, damming, or other disturbance of the soil, it seems entirely plausible that USDA experts could nonetheless conclude that the removal of bottomland hardwoods from Field 16 had more than minimal effects. Moreover, both the statute and the regulation applicable to the minimal effects exemption clearly provide that this determination is to be made by the agency. 16 U.S.C.A. § 3822(f) (West 2000); 7 C.F.R. § 12.5(b)(1)(v) (2005). Because there is no indication in the record that the USDA addressed minimal effects, if we were to reach Holly Hill's claim on this issue and find that the USDA erred in failing to

make a minimal effects determination before denying benefits, we would be required to remand the fact-specific question of whether there were only minimal effects.

Secondly, apart from the issue of whether Holly Hill would ultimately be entitled to a minimal effects exemption on remand, we cannot say that the USDA's initial failure to make the minimal effects determination in the instant case rises to the level of clear error. Admittedly, in *B&D Land & Livestock Co. v. Veneman*, 231 F. Supp. 2d 895 (N.D. Iowa 2002), the district court explained that "the Hearing Officer could not properly consider whether removal of woody vegetation, standing alone, is enough to result in the 'conversion' of a wetland . . . unless the Hearing Officer had first determined that the purported 'conversion' would have more than a 'minimal effect' on the wetland functions and values." *Id.* at 908. Similarly, the district court in *Rosenau v. Farm Serv. Agency*, 395 F. Supp. 2d 868 (D.N.D. 2005), stated that "[t]here is no question that the Defendants may declare a person ineligible for USDA farm program benefits *only* after a determination of their eligibility for a minimal effect exemption." *Id.* at 874 (emphasis added)(citing 7 C.F.R. § 12.4(g); 7 C.F.R. § 12.5(b)(1)(v) (2005)). However, the regulations suggest that a person seeking benefits must request consideration for this exemption.

The applicable regulation clearly states that a program benefits applicant should make a request for a minimal effects determination prior to any conversion activity and that if such prior request is not made, the applicant will bear the burden of demonstrating that the effect was minimal. *See* 7 C.F.R. § 12.31(d)(2005). While a SCS decision maker instructed the team making the 1991 wetland determination that "[m]inimal effect must be conducted at each of the four contested sites" and that a "worksheet should be completed for each site even if the appellant does not ask for a minimal effect determination," this related only to the four sites deemed to contain wetlands during the 1991 assessment, which did not include Field 16. (J.A. 233F.) Moreover, at oral argument, the government represented that the USDA would not be bound by such an instruction from an SCS employee.

Thus, the USDA's failure to make a minimal effects determination does not constitute plain error such that we should deviate from our

general rule against considering issues raised for the first time on appeal. Furthermore, we find that any possible error with regard to the minimal effects exemption would not amount to a miscarriage of justice. Holly Hill had numerous opportunities to raise its minimal effects argument, at both the administrative level and before the district court, and we decline to entertain it at this late stage.

## D.

In its final argument, Holly Hill contends that it was prevented from sustaining its burden of proof in challenging the agency's action because of alleged abuses of discretion by the USDA in the manner in which the administrative hearings were conducted. Specifically, Holly Hill argues that the following actions by the NAD Hearing Officer violated due process: (1) the denial of Holly Hill's request to subpoena witnesses; (2) the ex parte communications with the USDA regarding the subpoena requests; and (3) the participation in witness questioning during the NAD hearing. None of these claims have merit.

While the NAD Hearing Officer did deny Holly Hill's request for subpoenas to compel seven individuals to attend the hearing, the applicable regulation states that a subpoena shall be issued for a witness *only if* the Hearing Officer determines that

> the appellant or the agency has established that either a representative of the Department or a private individual possesses information that is pertinent and necessary for disclosure of all relevant facts which could impact the final determination, that the information cannot be obtained except through testimony of the person, and that the testimony cannot be obtained absent issuance of a subpoena.

7 C.F.R. § 11.8(2)(iii)(B) (2005). Furthermore, the regulations also make clear that it is within a Hearing Officer's discretion to "confine the presentation of facts and evidence to pertinent matters and exclude irrelevant, immaterial, or unduly repetitious evidence, information, or questions." 7 C.F.R. § 11.8(c)(5)(ii) (2005).

As the district court pointed out in its opinion, the NAD Hearing Officer had at his disposal a written record of all the relevant information supporting NRCS's technical determination and the FSA's resultant denial of benefits, as well as a record of the FSA county committee hearing at which many of the requested witnesses were examined. The NAD Hearing Officer reasonably determined that this information coupled with the testimony of the witnesses supplied by the USDA would be sufficient. While those people Holly Hill wished to subpoena may have possessed relevant information, this is not enough to show that they had relevant knowledge not otherwise available. The technical determination was not based on the thought processes or opinions of these persons, but rather on their notes and final reports which were all included on the record. Indeed, "inquiry into the mental processes of administrative decisionmakers is usually to be avoided" and formal findings are the appropriate basis of review when available. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). For these reasons, it is clear that the NAD Hearing Officer did not abuse his discretion by denying the subpoena requests.

The ex parte communication with which Holly Hill takes issue is that the NAD Hearing Officer faxed a note with a copy of Holly Hill's request for subpoenas to NCRS and FSA. The relevant regulations provide that

> At no time between the filing of an appeal and the issuance of a final determination under this part shall any officer or employee of the Division engage in ex parte communications regarding the merits of the appeal with any person having any interest in the appeal pending before the Division, including any person in an advocacy or investigative capacity. This prohibition does not apply to . . . [d]iscussions of procedural matters related to an appeal.

7 C.F.R. § 11.7(a)(1) (2005).

It seems clear that the exchange at issue here related to procedural matters only, and was initiated merely to aid the Hearing Officer in determining whether the requested witness had relevant information not otherwise available. There was no discussion of the merits of the

appeal. Thus, we agree with the district court's conclusion that the ex parte communication was not an abuse of discretion and did not indicate bias on the part of the Hearing Officer.

Lastly, Holly Hill argues that the NAD Hearing Officer acted improperly when he questioned witnesses and directed testimony at the hearing on behalf of the government. According to Holly Hill, this conduct coupled with the ex parte communication shows that the Hearing Officer was clearly biased in favor of the government; therefore, impartiality protections were violated and a new hearing is required. *See Utica Packing Co. v. Block*, 781 F.2d 71, 77-78 (6th Cir. 1986). For reasons discussed below, this argument is without merit.

The applicable regulation states that "[t]he hearing will be conducted by the Hearing Officer in the manner determined by the Division most likely to obtain the facts relevant to the matter or matters at issue." 7 C.F.R. § 11.8(a)(5)(ii) (2005). The hearing transcript makes clear, contrary to Holly Hill's contention, that the Hearing Officer did not act as counsel for the agency, but rather was simply attempting to ensure the proceeding remained on track and that relevant information was addressed. The Hearing Officer himself explained that he was "not trying to lead them, but . . . trying to maintain . . . focus and stick to the relevant facts." (J.A. 330.) As the district court found, the Hearing Officer's "attempt to clarify questions and answers, and to obtain all the applicable evidence, did not evidence improper bias or prejudice toward [the USDA]." (J.A. 453.)

III.

In sum, there is no basis in the record before us to hold that the USDA acted arbitrarily, capriciously, or in abuse of its discretion in denying Holly Hill benefits. Accordingly, we affirm the district court's grant of the motion for summary judgment.

*AFFIRMED*